Bernard C. DUSÉ, Jr., Plaintiff–
Appellant,

v.

INTERNATIONAL BUSINESS
MACHINES CORPORATION,
Defendant–Appellee.

Docket No. 00–7158.

United States Court of Appeals,
Second Circuit.

Argued Dec. 8, 2000.

Decided June 5, 2001.

Fred R. Profeta, Jr., New York, N.Y. (Profeta & Eisenstein, New York, NY, Christopher C. Burdett, Stamford, CT, on the brief), for Plaintiff–Appellant.

Patrick W. Shea, Stamford, CT (Peter M. Schultz, Paul, Hastings, Janofsky & Walker, Stamford, CT, on the brief), for Defendant–Appellee.

Before: OAKES, KEARSE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Bernard C. Dusé, Jr., appeals from a judgment of the United States District Court for the District of Connecticut, Janet Bond Arterton, *Judge,* dismissing his complaint seeking compensatory and punitive damages from defendant International Business Machines Corporation, Inc. ("IBM" or the "Company"), for emotional distress caused by IBM's alleged (1) breach of a confidentiality provision in a settlement agreement and (2) intentional infliction of emotional distress. The district court, though concluding that IBM had breached the confidentiality provision, granted summary judgment (a) dismissing the contract claim on the ground that, under Connecticut law, damages for mental distress are not available for a breach of contract, and (b) dismissing the tort claim for intentional infliction of emotional distress claim on the ground that there was no evidence that IBM either acted with intent to cause Dusé emotional distress or was aware that its breach of the confidentiality provision would have that effect. On appeal Dusé contends that the district court erred both in its interpretation of Connecticut contract law and in its ruling that there was no genuine issue to be tried as to IBM's awareness and intent. For the reasons that follow, we affirm the dismissal of both claims because IBM's disclosure did not breach the settlement agreement.

## I. BACKGROUND

The present litigation centers on a July 1992 agreement between the parties, settling prior disputes. Dusé contends that IBM breached a confidentiality provision of the settlement agreement by filing a Form 1099 with the Internal Revenue Service ("IRS"), reporting the amount of the settlement. The following facts, taken largely from court pleadings and rulings, are not substantially in dispute.

### A. The Prior Litigations

Dusé, an African–American, was employed by IBM from 1970 to 1984. In 1984 and 1986, he brought actions in federal court against IBM and certain individuals alleging that from 1977, the Company had discriminated against him on the basis of his race and retaliated against him because of his complaints of racial discrimination, in violation of 42 U.S.C. § 1981 (1982) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, . . . ."). In those actions, which were consolidated (collectively the "1980s litigation"), Dusé alleged that the Company had discriminated against him by, *inter alia,* failing to promote him despite his qualifications, falsifying records in order to justify the failure to promote, demoting him, inducing one of his subordinates to make false allegations of sexual harassment against him, and harassing him through racially debasing remarks, preventing him from properly performing his job responsibilities. He alleged further that when IBM terminated his employment in 1984, entitling him to severance pay and other benefits, it with-

held those sums until mid–1985 but nonetheless reported to the IRS that they had been paid in 1984, thereby unjustifiably exposing him to the possibility of tax liability and an IRS audit, and causing him substantial emotional distress. Dusé also alleged that IBM had invaded his privacy and violated his property rights by subjecting him to unlawful around-the-clock surveillance, and threatening him with physical harm. In 1989, Dusé commenced a suit against IBM in state court alleging the conduct that was the subject of the federal actions but seeking relief on different theories.

With respect to the invasions of his privacy, Dusé also successfully sued a security firm and its employees in a state-court action to which IBM was not a party. *See Dusé v. LSI, Inc.,* No. D.N. CV87 0088004 S (Conn.Sup.Ct. May 5, 1989) (finding numerous acts of harassment, trespass, and invasions of privacy by defendant security firm that was paid more than $500,000 by IBM to perform investigations and surveillance of Dusé; and awarding Dusé a total of $3,266,666.64 in compensatory, statutory, and punitive damages, and attorneys' fees).

B. *The Settlement Agreement and the Form 1099*

On July 3, 1992, the eve of trial in the consolidated federal cases, Dusé and IBM entered into an agreement ("July 3 Agreement") to settle all of Dusé's pending or potential claims, "including but not limited to Duse's current complaints before the Connecticut Commission on Human Rights and Opportunities; related charges filed before the Equal Employment Opportunity Commission, an action filed in Connecticut Superior Court; and, any other potential for [*sic*] claims Duse may have." (July 3 Agreement at 1.) IBM agreed to pay Dusé a specified sum, and the parties agreed to execute a formal document reflecting the other terms of their agreement, including a confidentiality agreement which was to contain clauses dealing with, *inter alia,* "tax indemnification." (*Id.* at 2.)

The parties executed the formal document on July 10, 1992 (the "Settlement Agreement" or "Agreement"). It stated that

> [t]his Settlement Agreement applies, but is not limited, to claims arising under any federal, state or local law or ordinance dealing with discrimination in employment on the basis of sex, race, national origin, religion, disability or age, including (i) Title VII of the Civil Rights Act of 1964; (ii) the Civil Rights Act of 1866, 42 U.S.C. § 1981; (iii) the Connecticut Human Rights and Opportunities Act; (iv) the Rehabilitation Act of 1973; (v) the Equal Pay Act; and (vii) Executive order 11246. This Settlement Agreement also covers claims based on theories of contract or tort, whether based on the common law or otherwise. This Settlement Agreement also covers all claims arising under the Employee Retirement Income Security Act of 1974, other than Dusé's vested rights in the IBM Retirement Plan.

(Settlement Agreement, Clause 3, at 4–5.) Dusé sought to have the payment from IBM characterized in such a way as to exclude it from his taxable income. Accordingly, Clause 6 of the Agreement provided, in pertinent part, as follows:

> *The parties agree that the payment provided for in the July 3 Agreement does not constitute wages. Rather, the payment constitutes compensation for personal injuries, emotional distress and pain and suffering and therefore is not subject to withholding taxes.* Dusé agrees to indemnify and hold IBM harmless from any portion of Dusé's tax

liability that IBM may be required to pay to the Internal Revenue Service, or any other taxing authority, as a result of not withholding from the payment specified in the July 3 Agreement.

(Settlement Agreement, Clause 6, at 5–6 ("Compensation Clause") (emphasis added).)

Clause 9 of the Settlement Agreement provided that the settlement amount specified in the July 3 Agreement was to be kept confidential by both parties except as provided in the Settlement Agreement. The penultimate paragraph of that Clause provided as follows:

IBM agrees that it will not disclose to any person, organization or entity, *except as may be required by law or by business necessity*, the amount of the payment set forth in the July 3 agreement; provided, however, that it may disclose such information to its attorneys, auditors, financial advisors and to persons within IBM with a reasonable business need to know, all of whom shall first agree to keep such information confidential.

(Settlement Agreement, Clause 9, at 7 (emphasis added).)

During the week of July 6, 1992, IBM made the payment called for in the July 3 Agreement. Its check was payable to Dusé and his attorneys Andrew B. Bowman and David S. Golub, as payees.

In January 1993, IBM filed a Form 1099–MISC ("Form 1099") with the IRS, reporting as "Miscellaneous Income" the amount paid to Dusé, Bowman, and Golub in settlement of Dusé's various suits and claims. IBM sent a copy of the form to Bowman, who relayed it to Dusé in February 1993. Dusé had filed his 1992 federal and state income tax returns in January 1993 and had not referred to the settlement payment from IBM in either return.

Dusé, upset upon learning of the filing of the Form 1099, promptly telephoned Bowman, who said he would have the matter corrected. Some months later, Bowman wrote to IBM counsel, stating that the filing of the Form 1099 breached the Settlement Agreement:

Paragraph 6 of the Agreement provides that the payment from IBM does not constitute wages. "Rather, the payment constitutes compensation for personal injuries, emotional distress and pain and suffering ...". The issuance of a 1099 is contrary to both the written agreement between the parties and the law relating to compensation for personal injuries, emotional distress and pain and suffering.

(Letter from Andrew B. Bowman to John S. McGueeney, June 10, 1993.) IBM, through counsel, responded that IBM was

required by 25 [*sic*] U.S.C. § 6041 to report all payments made to non-employees in excess of $600.00 This was contemplated in the Settlement Agreement at paragraph 9 where "IBM agrees that it will not disclose ... except as may be required by law"....

Should the IRS contact your client, it was also contemplated by the Settlement Agreement that your client would rely on paragraph 9 thereof to demonstrate the parties' agreement that the payment does not constitute wages, hence there was no federal income tax withheld.

(Letter from Richard J. Sweetnam to Andrew B. Bowman, July 21, 1993.)

## C. *The Present Suit*

In June 1994, Dusé commenced the present action in state court; IBM removed it to the district court, invoking diversity jurisdiction. The first count of the complaint alleged that IBM's filing of the Form 1099 was neither required nor justified and that that filing, together with

IBM's refusal to retract it, constituted a breach of the Settlement Agreement. The second count alleged that IBM had engaged in tortious conduct, filing the Form 1099 solely for the purposes of harassing and annoying Dusé by exposing him to an unwarranted tax audit and causing him emotional distress.

In 1996, following a modicum of discovery, IBM moved for summary judgment dismissing the complaint, arguing principally that its filing of the Form 1099 did not breach the Settlement Agreement. It stated, *inter alia*, that the Settlement Agreement permitted IBM to disclose the settlement amount as might be required by law or business necessity; that the settlement had been made in exchange for Dusé's release of all claims against IBM, including employment discrimination claims and claims for attorneys' fees; that the Form 1099 had disclosed that Dusé, Bowman, and Golub were the recipients of the payment; that IBM faced potential civil penalties if it improperly failed to file the Form 1099; and that it was IBM's regular course of practice to file Form 1099s in connection with employee litigation settlements. IBM also pointed out, citing Dusé's answer to an interrogatory, that the IRS had not contacted Dusé or commenced audit proceedings with respect to the Form 1099, and hence the filing had not caused Dusé any injury. In opposition to the motion, Dusé argued, *inter alia*, that there was no legal requirement that IBM file the Form 1099 and that to the extent that IBM's motion relied on other grounds, it was premature because the parties had agreed to hold discovery in abeyance pending resolution of the purely legal question of whether the law required the filing of the form.

The summary judgment motion was referred to a magistrate judge for report and recommendation. The magistrate judge recommended that the motion be granted on the basis that IBM's filing the Form 1099 did not breach the Settlement Agreement. She noted that Dusé's 1980s litigation had included claims of employment discrimination and entitlement to attorneys' fees, and that payments in excess of $600 in settlement of employment discrimination claims or for attorneys' fees are taxable, *see, e.g., United States v. Burke*, 504 U.S. 229, 242, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) (settlement payments for claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), as in effect in 1986, are "not ... damages received ... on account of personal injuries" which would be tax-exempt under 26 U.S.C. § 104(a)(2) (internal quotation marks omitted)); *Burda v. M. Ecker Co.*, 954 F.2d 434, 437 (7th Cir. 1992) (payments of opposing party's attorneys' fees exceeding $600 in a single year are reportable payments under 26 U.S.C. § 6041). The magistrate judge also noted that the parties' characterization of the payment was not necessarily dispositive, *see Bagley v. Commissioner of Internal Revenue*, 105 T.C. 396, 406, 1995 WL 730447 (1995) ("an express allocation set forth in [a] settlement is not necessarily determinative if other facts indicate that the payment was intended by the parties to be for a different purpose"). Thus, the magistrate judge concluded that IBM was required by law to report the payment made to Dusé, Bowman, and Golub in order to permit the IRS to determine whether the settlement payment, or part of it, was taxable.

In a Ruling on Plaintiff's Objection to [the Magistrate Judge's] Recommended Ruling, dated March 31, 1998 ("1998 Opinion"), the district court concluded that partial summary judgment should be granted dismissing the contract claim, though it rejected the magistrate judge's rationale. The district court stated that the magis-

trate judge's conclusion that IBM did not breach the Settlement Agreement "conflate[d] the authority of the IRS to determine taxability of income with defendant's legal reporting duty," 1998 Opinion at 3, and the court held that IBM had no duty to report. The court concluded, however, that because Dusé had no evidence that the IRS had taken or planned to take any action against him on account of the 1992 payment, and his only claimed injury was his severe and intense emotional distress, including fear, anxiety, and apprehensiveness, resulting from IBM's filing of the Form 1099 with the IRS, the contract claim must fail under Connecticut law because Dusé "suffered no compensable damages resulting from his breach of contract claim." *Id.* at 5.

> [M]ental suffering caused by breach of contract, although it may be a real injury, is generally not a basis for compensation in breach of contract actions.... Duse has not demonstrated the existence of any damages resulting from IBM's breach of the confidentiality agreement apart from his claimed emotional distress, which is the subject of a separate tort claim in this action, and the Court therefore concludes that IBM is entitled to summary judgment on plaintiff's breach of contract claim.

*Id.* The court rejected the recommendation for dismissal of Dusé's tort claim for intentional infliction of emotional distress because discovery on that claim had been stayed and was incomplete.

Following the completion of discovery on the tort claim, IBM renewed its motion for summary judgment dismissing that claim, contending principally that there was no evidence that it intended to cause Dusé distress and that sending the IRS a Form 1099 with respect to a settlement of an employment dispute was its customary practice. In opposition to the renewed motion, Dusé contended that there were issues to be tried as to IBM's motivation for filing the Form 1099. He contended, *inter alia*, that IBM's evidence of its customary filing practice was hardly dispositive since IBM produced Form 1099s for fewer than half of its employment settlements and could not say what had been done in the rest; he argued that its filing with respect to his particular settlement may have been a continuation of the racially motivated harassment of which he complained in the 1980s litigation.

In a Ruling on Defendant International Business Machine Corporation's Motion for Summary Judgment, dated January 7, 2000, *see* 2000 WL 306955 (Jan. 10, 2000), the district court granted the motion to dismiss the tort claim.

> To prevail on a claim for intentional infliction of emotional distress, the plaintiff must prove: (1) that the actor intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of its conduct, (2) that the conduct was extreme and outrageous, (3) that the defendant's conduct was the cause of the plaintiff's distress, and (4) that the emotional distress sustained by the plaintiff was severe. See *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986). In its motion for summary judgment, IBM challenges plaintiff's proof as to elements (1), (2) and (3).

2000 WL 306955, at *3. The court concluded that Dusé failed to present evidence sufficient to show a genuine issue to be tried as to the first and third elements. As to Dusé's contention that IBM knew or should have known that filing the Form 1099 would cause him emotional distress, the court noted the absence of any evidence that, in the Settlement Agreement negotiations, the filing of a Form 1099 was ever discussed by the parties:

[C]ritically absent from this record is any evidence that IBM was ever made aware of or put on notice of Mr. Duse's particular sensitivity to the filing of the Form 1099 such that a reasonable inference could be drawn that IBM knew or should have known that plaintiff's emotional distress would likely result. Although Mr. Duse testifies he made known to Andrew Bowman, his attorney, his concern that IBM might report the settlement amount to the IRS during the settlement negotiations, . . . and that Attorney Bowman reassured him that such concern was covered by the Settlement Agreement's language, *there is no language in the final agreement from which it is reasonably inferable that IBM knew or was aware that filing the Form 1099 would cause Mr. Duse undue emotional distress. . . . Nor were there any promises made by the parties with respect to the filing of the Form 1099 or even any discussion about employer disclosure obligations until after the filing.* Further, the terms of the Settlement Agreement by which Mr. Duse agreed to indemnify IBM for any liability it accrued for failing to withhold taxes suggests that it was at least contemplated by the parties that the IRS might subsequently determine that the payment was in whole or in part subject to tax withholding notwithstanding the parties' characterization of the proceeds. Although by reporting the payment to the IRS, IBM may have increased the likelihood of IRS review, there is nothing in the record from which one could infer that IBM knew or should have known that such an act would cause Mr. Duse undue or severe emotional distress. . . . *There simply is no admissible evidence offered that Mr. Duse or his attorney ever raised, mentioned or addressed with IBM's lawyers in the course of negotiating and executing the*

*Settlement Agreement in July 1992 whether a Form 1099 would be issued. Id.* at *4 (emphases added). The court also observed that the IBM attorney who filed the form testified that he did so because he had believed that such filing was required by the tax laws (albeit erroneously, in the court's view) and by IBM's internal policy, and that Dusé had adduced no admissible evidence, but only his own speculation, to the contrary. *See id.* at *5. Having concluded that Dusé had failed to present sufficient evidence to require a trial as to the issues of IBM's intent or awareness, the court did not reach the question of whether IBM's conduct could reasonably be viewed as extreme or outrageous. *See id.*

## II. DISCUSSION

On appeal, Dusé contends that the district court erred (a) in ruling that under Connecticut law emotional distress damages may not be recovered for breach of contract, and (b) in concluding that there were no genuine issues to be tried as to whether IBM knew or should have known that filing a Form 1099 with the IRS would cause Dusé emotional distress, and whether IBM intended to inflict such distress. IBM contends that the rulings challenged by Dusé were not error, and that, in any event, dismissal of the contract claim should be upheld on the ground that there was no breach, *see, e.g., Citrus Marketing Board of Israel v. J. Lauritzen A/S,* 943 F.2d 220, 223 (2d Cir.1991) (appellate court may affirm district court judgment on any basis that finds support in the record). In support of its contention that there was no breach, IBM argues that the filing of a Form 1099 for the payment to Dusé and his attorneys was required by law, or at least that the absence of such a requirement was sufficiently unclear that filing, as an exercise of caution, was a

business necessity. For the reasons that follow, we conclude that Dusé's contract claim was properly dismissed because IBM's filing of the Form 1099 did not breach the Settlement Agreement; we also conclude, therefore, that the tort claim was properly dismissed because IBM's filing the Form 1099 could not rationally be characterized as outrageous conduct.

### A. The Contract Claim

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(c); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and do not suffice to defeat a motion for summary judgment. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir.1992), *cert. denied*, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11–12 (2d Cir.1986) (the existence of a factual issue will not suffice to defeat a motion for summary judgment where that issue is not material to the ground of the motion), *cert. denied*, 480

U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

■ Whether a written contract is ambiguous is a question of law for the court. *See, e.g., Bank of Boston Connecticut v. Schlesinger*, 220 Conn. 152, 158, 595 A.2d 872, 875 (1991). "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms," *F & W Welding Service, Inc. v. ADL Contracting Corp.*, 217 Conn. 507, 517, 587 A.2d 92, 98 (1991), and those terms may be the basis for summary judgment, *see, e.g., Heyman Associates No. 1 v. Insurance Company of the State of Pennsylvania*, 231 Conn. 756, 769, 653 A.2d 122, 130 (1995).

The language of the Settlement Agreement in the present case is unambiguous. The Agreement did not by its terms forbid IBM to file a Form 1099. Indeed, Dusé himself admitted as much in an affidavit he submitted in opposition to summary judgment, as he noted that his attorney did "not insist[ ] that the Settlement Agreement be drafted in language sufficiently clear and precise to preclude such an action by IBM." (Affidavit of Bernard C. Dusé, Jr., sworn to July 12, 1999, ¶ 49.) The Settlement Agreement stated merely that IBM would not disclose the amount paid "except as may be required by law or by business necessity." (Settlement Agreement, Clause 9, at 7.) The contract does not appear to be unclear; what may have been unclear was the law.

At all pertinent times, the Internal Revenue Code ("Code"), has generally required a taxpayer, in his income tax returns, to report his gross income, *see* 26 U.S.C. § 1, and has broadly defined "gross income [to] mean[ ] all income from whatever source derived," 26 U.S.C. § 61(a), subject only to exclusions specifically enumerated elsewhere in the Code. *See, e.g., United States v. Burke*, 504 U.S. 229, 233,

112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) ("The definition of gross income under the Internal Revenue Code sweeps broadly.") In order to assist the IRS in its determination of an individual's receipt of income, the Code includes § 6041(a), which requires reports by certain payors:

All *persons* engaged in a trade or business and *making payment* in the course of such trade or business to another person, *of rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income* ..., of $600 or more in any taxable year, ... *shall render a true and accurate return to the Secretary,* under such regulations and in such form and manner and to such extent as may be prescribed by the Secretary, *setting forth the amount of such gains, profits, and income, and the name and address of the recipient of such payment.*

26 U.S.C. § 6041(a) (emphases added). *See, e.g., United States v. Carroll,* 345 U.S. 457, 73 S.Ct. 757, 97 L.Ed. 1147 (1953) (discussing precursor to § 6041); *United States v. Haimowitz,* 404 F.2d 38, 40 (2d Cir.1968) ("[S]ection 6041 is intended to help the government locate and check upon recipients of income and the amounts they receive."); *United States v. Dumaine,* 493 F.2d 1257, 1258 (1st Cir.1974) (per curiam) (same).

Pursuant to § 6041, the Secretary of the Treasury has adopted "[p]rescribed form[s]" for such information returns, including Form 1099. 26 C.F.R. § 1.6041–1(a)(2). With certain exceptions not pertinent here, the regulations require that

every person engaged in a trade or business shall make an information return for each calendar year with respect to payments it makes during the calendar year in the course of its trade or business to another person of fixed or determinable income,

*Id.* § 1.6041–1(a)(1)(i), where such payments constitute, *inter alia,* "[s]alaries, wages, commissions, fees, and other forms of compensation for services rendered aggregating $600 or more," *id.* § 1.6041–1(a)(1)(i)(A). "Income is determinable whenever there is a basis of calculation by which the amount to be paid may be ascertained." *Id.* § 1.6041–1(c). Included in the "[p]ayments specifically" reportable under this regulation are "[f]ees for professional services paid *to attorneys,* ... if paid by persons engaged in a trade or business and paid in the course of such trade or business." *Id.* § 1.6041–1(d)(2) (emphasis added); *see, e.g., Burda v. M. Ecker Co.,* 954 F.2d 434, 437 (7th Cir.1992) ("payments of attorney's fees, when 'fixed and determinable' and exceeding $600.00 in a single year, are reportable payments under § 6041 of the Internal Revenue Code"); *see also Marlar, Inc. v. United States,* 151 F.3d 962, 968 (9th Cir.1998) (where the payments of $600 or more are "made in a *trade or business* [,] there need . not be an employer-employee relationship" (emphasis in original)).

The Code imposes potentially severe monetary penalties on a person required to file an information return for, *inter alia,* "any failure to file an information return with the Secretary." 26 U.S.C. § 6721(a)(2)(A). If a given failure was intentional and without reasonable cause, *see id.* § 6724 (allowing waiver of penalty upon a showing that failure was "due to reasonable cause and not to willful neglect"), the penalty may be as great as 10 percent of the unreported payment amount. *See id.* § 6721(b)(2)(A) (1992), *renumbered* § 6721(e)(2)(A) in 2000 Code.

The dispute in the present case centers on whether an information return was unnecessary here on the ground that the

settlement payment to Dusé fell within an exclusion from gross income provided in § 104(a)(2) of the Code. In 1992, when the parties entered into the Settlement Agreement, that section provided, in pertinent part, that "gross income does not include ... (2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness," 26 U.S.C. § 104(a)(2) (1992), *amended by* Small Business Job Protection Act of 1996, Pub.L. 104–188, § 1605(a) (1996) (inserting "(other than punitive damages)" after "damages"; changing "personal injuries" to "personal physical injuries"; and changing "sickness" to "physical sickness"). IRS regulations under the 1992 version of § 104(a)(2) stated, *inter alia*, that

> [t]he term "damages received (whether by suit or agreement)" means an amount received ... through prosecution of a legal suit or action *based upon tort or tort type rights,* or through a settlement agreement entered into in lieu of such prosecution.

26 C.F.R. § 1.104–1(c) (1992) (emphasis added).

In *United States v. Burke,* decided some six weeks before the parties here entered into their Settlement Agreement, the Supreme Court held that a backpay award in a 1986 settlement of an employment discrimination claim brought under Title VII did not fall within the "personal injuries" exclusion from gross income set out in § 104(a)(2) of the Code. *See* 504 U.S. at 242, 112 S.Ct. 1867. The *Burke* Court noted that

> [n]either the text nor the legislative history of § 104(a)(2) offers any explanation of the term "personal injuries." Since 1960, however, IRS regulations formally have linked identification of a personal injury for purposes of

§ 104(a)(2) to traditional tort principles. . . . The essential element of an exclusion under section 104(a)(2) is that *the income involved must derive from some sort of tort claim* against the payor. . . .

> A "tort" has been defined broadly as a "civil wrong, other than breach of contract . . . ."

*United States v. Burke,* 504 U.S. at 234, 112 S.Ct. 1867 (other internal quotation marks omitted) (emphases added). The Court held that a claim of employment discrimination in violation of Title VII was not a tort claim within the meaning of that regulation. While noting that discrimination could doubtless constitute " 'personal injury' for purposes of § 104(a)(2) *if the relevant cause of action evidenced a tort-like conception of injury and remedy,*" *United States v. Burke,* 504 U.S. at 239, 112 S.Ct. 1867 (emphasis added), the Court observed that "Title VII focuses on 'legal injuries of an economic character,' " *id.* (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)).

Further, dealing with Title VII as it stood prior to its amendment in 1991, the Court noted that the remedial scheme of Title VII, which provided for equitable relief but not for damages, was more limited than that applicable to traditional tort-type claims, *see United States v. Burke,* 504 U.S. at 239–40, 112 S.Ct. 1867. *See generally* Civil Rights Act of 1991, Pub.L. 102–166, Title I, § 102 (codified at 42 U.S.C. § 1981a) (amending Title VII to provide right to a jury trial, and expanding available relief to include limited compensatory and punitive damages); *see also Landgraf v. USI Film Products,* 511 U.S. 244, 252, 282–86, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (1991 amendments to Title VII do not apply to conduct occurring before November 21, 1991). The *Burke* Court noted

that the remedies available under Title VII before 1991, corresponding to economic harms such as "deprivation of full wages earned or due for services performed," largely "consist[ed] of restoring victims, through backpay awards and injunctive relief, to the wage and employment positions they would have occupied absent the unlawful discrimination." 504 U.S. at 239, 112 S.Ct. 1867. The Court stated that "[n]othing in this remedial scheme purports to recompense a Title VII plaintiff for any of the other traditional harms associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages. . . ." *Id.* It noted that the remedies available under Title VII contrasted markedly "not only [with] those available under traditional tort law, but under other federal antidiscrimination statutes, as well," including § 1981. *United States v. Burke,* 504 U.S. at 240, 112 S.Ct. 1867 (noting that " § 1981[ ] permits victims of race-based employment discrimination to obtain a jury trial at which 'both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages' may be awarded").

■ It was against this legal landscape that IBM was to determine whether or not to file a Form 1099 with respect to the settlement payment it made to Dusé and his attorneys. For several reasons, we conclude that its decision to file did not breach the Settlement Agreement.

First, although Dusé's 1980s litigation was not brought under Title VII, the nature of his principal substantive allegations paralleled those of a not-atypical Title VII action. The action he commenced against IBM in 1984 was "brought pursuant to Title 42 U.S.C. § 1981, barring discrimination in employment on the basis of race, and pursuant to th[e] Court's pendent jurisdiction over plaintiff's breach of contract

claims" (Amended complaint, first action, ¶ 2), and complained of injuries "suffered because the defendants have discriminated and continue to discriminate against him on the basis of race in the opportunities for and terms and conditions of employment, in violation of federal law and defendant's contractual representations, and have retaliated against plaintiff for his complaints of defendants' racial discrimination" (*id.* ¶ 1). The corresponding paragraphs of the complaint filed in his 1986 suit were substantially identical to these paragraphs. The complaint in the first suit also requested, *inter alia,* that Dusé be "reinstate[d] . . . to defendant IBM's work force in an appropriate managerial level position with full credit for back pay, seniority and benefits." (Amended complaint, first action, WHEREFORE ¶ (4).) Thus, parts of Dusé's complaints plainly dealt with legal injuries of an economic character and provided no basis for assuming that a settlement payment to him would be entitled to tax treatment any different from that given the settlement payments dealt with in *Burke.* On the other hand, Dusé also complained of threats to his personal safety and of invasions of his privacy, traditional tort-type claims, and he requested "compensatory and punitive damages," relief that would not then have been available under Title VII. Thus, some parts of the complaints were unlike the claims dealt with in *Burke,* though the controversy between the parties plainly had its origin in Dusé's employment.

The 1992 Settlement Agreement was entered into on the eve of the trial of the claims alleged in those complaints, and that Agreement stated that it applied to, *inter alia,* claims under "any federal, state or local law or ordinance dealing with discrimination in employment," including § 1981, Title VII, the Equal Pay Act, and the Employee Retirement Income Security

Act, as well as claims based on contract. (Settlement Agreement, Clause 3, at 4.) Although the Settlement Agreement also covered claims based on tort theories, most of the pending or potential claims mentioned were claims having economic origins. Thus, notwithstanding the parties' agreement that the payment called for by the July 3 Agreement "constitutes compensation for personal injuries, emotional distress and pain and suffering" (Compensation Clause at 5), the amount Dusé received was occasioned by lawsuits asserting principally claims that were not tort claims but economic claims rooted in the employment relationship. Accordingly, because payment for the bulk of Dusé's claims may have fallen outside the scope of § 104(a)(2)'s exclusion from gross income, it may well be that IBM was required by the Code or IRS regulations to file a Form 1099 reporting the amount it had paid to Dusé in settlement.

Second, the settlement required that IBM's check be made "payable to Bernard C. Duse, Jr. *and his attorneys.*" (July 3 Agreement at 2 (emphasis added).) Plainly, payments to Dusé's attorneys were not payments for anyone's pain and suffering or emotional distress but were income taxable to the attorneys, and hence may have been "[p]ayments specifically" reportable under the terms of 26 C.F.R. § 1.6041-1(d)(2). Dusé contends that the requirement for filing a Form 1099 was nonetheless not triggered, arguing that the amounts the attorneys would receive were not "determinable" within the meaning of § 1.6041-1(c) because "IBM had no basis for 'calculating' what portion of the settlement payment might be allocable to taxable categories" (Dusé brief on appeal at 27–28). The correctness of this interpretation of "determinable" is hardly clear. The regulation does not state that the taxable portion must be calculable by the payor. Rather, income is determinable,

according to the regulation, "whenever *there is* a basis of calculation by which the amount to be paid may be ascertained." 26 C.F.R. § 1.6041-1(c) (emphasis added). A private revenue ruling cited by IBM states that when a payor "issues directly to the attorney a single check in the joint names of the claimant and attorney," an information return is required even though the attorney "do[es] not take the full amount" of the attorney fee portion of the check. IRS Private Letter Ruling, 1988 WL 572425 (Aug. 19, 1988). Although such a ruling is not to be used or cited as precedent, *see id.*; 26 U.S.C. § 6110(j)(3), its issuance plainly forecloses any suggestion that, in circumstances similar to those here, the lack of a filing requirement was clear. Accordingly, it may well be that IBM was required by the Code and the regulations to file a Form 1099 because the payees included the attorneys.

We need not, however, definitively determine whether the economic origin of Dusé's principal claims, or their similarity to claims under Title VII, or the inclusion of attorneys' fees in the bulk settlement payment triggered the filing requirements of the tax laws, for if indeed a Form 1099 was not required, the absence of such a requirement was, in the circumstances, entirely unclear. And given that lack of clarity, together with the potential for a substantial unreimbursed and undiluted penalty if an information return was required and not filed, filing a Form 1099 was at least a business necessity.

We characterize the potential penalty as unreimbursed for two reasons. First, though Dusé agreed to indemnify IBM for any payment it might be required to pay "as a result of not withholding" from the settlement payment (Compensation Clause at 5–6), he did not agree to indemnify IBM for any penalty imposed for failure to file any required return. Second, if he had so

agreed, we question whether such an agreement would have been enforceable. *See generally Solomon v. Gilmore*, 248 Conn. 769, 785, 731 A.2d 280, 289 (1999) ("a penalty implies a prohibition"; "every contract made for or about any matter or thing which is prohibited ... is a void contract"). Nor could IBM have diluted such a penalty by deducting its payment as a business expense. *See* 26 U.S.C. § 162(f) ("No deduction shall be allowed ... for any fine or similar penalty paid to a government for the violation of any law.").

We do not know the maximum dollar amount that IBM could have been penalized, for the parties have redacted the settlement amount. It seems likely, however, that such a penalty was potentially substantial. A state court had found that Dusé's claims against a security firm for trespass and invasion of his privacy at the instigation of IBM were worth more than $3.2 million. Were that the amount of IBM's settlement payment, its penalty exposure would have been more than $300,000. Whatever the amount paid by IBM to settle Dusé's broader array of claims against it, it is clear that for IBM to chance incurring an unindemnified, nondeductible penalty of up to 10 percent of the settlement amount, simply for not filing a report that the Settlement Agreement did not address, would have been an unreasonable business risk.

We conclude that IBM's filing the Form 1099 did not breach the provision of the Settlement Agreement that stated that IBM would disclose the settlement amount only "as may be required by law or by business necessity." The contract claim was therefore properly dismissed.

B. *The Intentional–Infliction–of–Emotional–Distress Claim*

█ Our conclusion that IBM's filing of the Form 1099 did not breach the Set-

tlement Agreement also requires affirmance of the dismissal of Dusé's tort claim. As the district court noted, in order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove, *inter alia,* that the defendant's "conduct was extreme and outrageous," *DeLaurentis v. City of New Haven,* 220 Conn. 225, 266, 597 A.2d 807, 828 (1991); *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337, 1342 (1986). Conduct that either was required by law or was a business necessity cannot rationally be so characterized.

Accordingly, Dusé's claim for intentional infliction of emotional distress must fail.

## CONCLUSION

We have considered all of Dusé's arguments on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.