446 F.3d 313
 AMERICAN HOME ASSURANCE COMPANY, As Subrogee of Caterpillar, Inc., Plaintiff-Appellant,
v.
HAPAG LLOYD CONTAINER LINIE, GMBH, Defendant-Cross-Claimant-Appellee,
The Burlington Northern and Santa Fe Railway Company, Defendant-Cross-Defendant-Appellee,
Matson Intermodal Systems, Defendant-Cross-Claimant,
Danzas Aei Intercontinental, Defendant-Cross-Defendant.
Docket No. 04-5605 CV.
 United States Court of Appeals, Second Circuit.
 Argued: October 19, 2005.
 Decided: May 3, 2006.
 
 Matthew T. Loesberg (Edward C. Radzik, Matthew T. Loesberg, Lori J. Quinn, on the brief), Donovan Parry McDermott & Radzik, New York, New York, for Plaintiff-Appellant.
 Michael J. Ryan, Hill, Betts & Nash, LLP, New York, New York, for Defendant-Cross-Claimant-Appellee.
 Ronald E. Joseph, Landman Corsi Ballaine & Ford, New York, New York, for Defendant-Cross-Defendant-Appellee.
 Before: KEARSE, MINER, HALL, Circuit Judges.
 HALL, Circuit Judge.
 
 
 1
 On July 23, 2002, a Burlington Northern and Santa Fe Railway Company ("BNSF") train derailed en route to Long Beach, California from Chicago, Illinois. The derailment resulted in extensive damage to cargo, including a containerized shipment of two engines owned by Caterpillar, Inc. ("Caterpillar"). This case concerns BNSF's right to limit its liability to $500.00 for the loss and damage to the engines pursuant to the contracts governing the shipment.
 
 I. Background
 
 2
 The shipment originated at Caterpillar's facility in Morton, Illinois and was destined for a Caterpillar affiliate in Singapore. Caterpillar booked the entire shipment with Danzas AEI ("Danzas"), a freight forwarder. Danzas, in turn, engaged G & D Transportation to carry the cargo from Morton to Chicago by truck and Hapag Lloyd Container Linie, GmbH ("Hapag Lloyd") to ship the cargo from Chicago to Singapore, via Long Beach. Hapag Lloyd then hired Matson Intermodal Systems ("Matson") to arrange the cargo's shipment from Chicago to Long Beach. Matson contracted with BNSF to carry the cargo by rail from Chicago to Long Beach. Due to the derailment, the container carrying the two engines never reached Long Beach.
 
 
 3
 American Home Assurance Company ("American Home"), as subrogee of Caterpillar, brought this action against Danzas, Hapag Lloyd, Matson, and BNSF seeking to recover $234,585.88 for the total loss of the engines. BNSF claimed, as an affirmative defense, that it was entitled to limit its liability under either its contract with Matson or the Express Cargo Bill ("ECB"), the bill of lading pursuant to which Hapag Lloyd agreed to ship the engines from Chicago to Singapore. American Home and BNSF filed competing motions for partial summary judgment concerning BNSF's right to limit its liability. The District Court granted BNSF's motion for partial summary judgment, concluding that the BNSF-Matson agreement limits the rail carrier's liability to $500 per package. In doing so, the District Court determined that it need not consider the limitation provision in the ECB, as that provision — if applicable — would limit BNSF's liability to the same amount. Thereafter, the parties, without waiving their rights of appeal, consented to the entry of a final judgment against Hapag Lloyd and BNSF jointly and severally in the amount of $1,000 (i.e., $500 per engine).[1] For the reasons stated below, we conclude that the ECB limits BNSF's liability to the same amount and affirm the judgment of the District Court.
 
 II. Discussion
 A. Applicable Law
 
 4
 "We review de novo the district court's grant of a motion for partial summary judgment, but we only undertake to do so when, as here, a final decision has rendered the case appealable." Ehrlich v. American Airlines, Inc., 360 F.3d 366, 370 (2d Cir.2004) (citation omitted). Summary judgment is only appropriate where the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there is a genuine issue as to any material fact, "the court must view the evidence in the record in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.2001). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir.2002). We may, however, "affirm a district court's grant of summary judgment on any ground upon which the district court could have rested its decision." Santos v. Murdock, 243 F.3d 681, 683 (2d Cir.2001).
 
 
 5
 As this is a contract dispute, "a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning." Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir.1993). Although the interpretation of these agreements is governed by federal common law, see Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 22-23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004), "[i]n developing federal common law in an area, [we] may look to state law," Critchlow v. First UNUM Life Ins. Co. of Am., 378 F.3d 246, 256 (2d Cir.2004). Contract language is ambiguous if it is "`capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir.1997) (quoting Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1192 (2d Cir.1996)). If the court determines that "the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms, and those terms may be the basis for summary judgment." Dusé v. Int'l Bus. Machs. Corp., 252 F.3d 151, 158 (2d Cir.2001) (internal quotation and citation omitted). We find the language of the contractual provisions at issue here to be clear and unambiguous.
 
 B. The BNSF-Matson Agreement
 
 6
 By incorporating the BNSF Intermodal Rules and Policies Guide, the BNSF-Matson agreement provides:
 
 
 7
 If a shipment moves under the terms of a through intermodal ocean bill of lading with BNSF as a participating rail carrier, the liability of BNSF will be no greater than the liability of the ocean carrier issuing the bill of lading.
 
 
 8
 Clause 7(2) of the ECB, in turn, limits Hapag Lloyd's liability:
 
 
 9
 [W]here the Carriage is to or from a port or final destination in the United States, the Carrier's limitation of liability in respect of the Goods shall not exceed U.S.$500.00 per package ....
 
 
 10
 The District Court concluded that these two provisions were applicable and operated together to limit BNSF's liability to $500 per package. In so holding, the District Court made four determinations: (1) the ECB constitutes a through bill of lading; (2) the ECB had been "issued" insofar as it governed the rights of the parties; (3) Caterpillar is bound by the ECB; and (4) the BNSF train originated at a port — Chicago — and was headed to a port — Long Beach — in the United States.
 
 
 11
 On appeal, American Home raises two points of error with respect to the District Court's factual determinations. First, American Home contends that the District Court improperly conflated two distinct concepts: whether the ECB had been issued and whether its terms, nonetheless, governed the parties. American Home concedes the terms of the ECB, but argues that the ECB had to have been issued in order for the BNSF-Matson agreement to limit BNSF's liability to that of Hapag Lloyd. Second, American Home contends that the District Court erroneously divided the shipment into two separate carriages — one inland by rail and another overseas by ship. According to American Home, Clause 7(2) of the ECB is inapplicable, because, when properly viewed as a single carriage from Morton to Singapore, the shipment was not to or from a port or final destination in the United States. We need not address these contentions, however, because BNSF is entitled to the same $500 per package limitation pursuant to a separate provision of the ECB.
 
 C. The ECB
 
 12
 While the ECB contains several provisions, such as Clause 7(2), related to Hapag Lloyd's liability as the carrier, the parties agree that it also contains a "Himalaya Clause" at Clause 5(1) extending the application of the Carriage of Goods by Sea Act, 49 Stat. 1207, 46 U.S.C.App. §§ 1300 et seq. ("COGSA") — including its $500 per package limitation on liability, see id. § 1304(5) — to certain downstream parties expected to take part in the shipment before the goods are loaded on and after they are discharged from Hapag Lloyd's ship.[2] The Himalaya Clause states in relevant part:
 
 
 13
 The provisions set forth in COGSA shall (except as may be otherwise specifically provided herein) also govern before the Goods are loaded on and after they are discharged from the Vessel provided, however, that the Goods at said time are in the actual custody of the Carrier or any Sub-Contractor.
 
 
 14
 The sole factual point in dispute with respect to the applicability of the Himalaya Clause to BNSF on appeal is whether the rail carrier is a sub-contractor within the meaning of the ECB. In considering the issue, we are mindful of the Supreme Court's recent admonition that "there is no special rule for [interpreting] Himalaya Clauses." Kirby, 543 U.S. at 31, 125 S.Ct. 385. In other words, they "must be construed like any other contracts: by their terms and consistent with the intent of the parties." Id.
 
 The ECB defines "`Sub-Contractor[s]'" as:
 
 15
 [O]wners and operators of vessels (other than the Carrier), Underlying Carriers, stevedores, terminal and groupage operators, road and rail transport operators and any independent contractors employed by the Carrier in the performance of the Carriage.
 
 
 16
 American Home concedes, as it must, that BNSF is an underlying carrier,[3] but contends that BNSF is not a sub-contractor, because it was "employed by" Matson not Hapag Lloyd. Therefore, American Home argues that BNSF is a sub-sub-contractor of Hapag Lloyd and, as such, is not entitled to COGSA's $500 per package limitation. We disagree.
 
 
 17
 In making that argument, American Home fails to appreciate the nature of the relationship between Hapag Lloyd and Matson. Article 3 of Matson's standard terms and conditions, incorporated into the contract between Matson and Hapag Lloyd, states:
 
 
 18
 [Matson] is a shipper's agent, and will act for [Hapag Lloyd] in arranging for the transportation of the Units. [Matson] does not itself provide transportation or assume carrier or insurance obligations.
 
 
 19
 "When a duly constituted agent acts in accordance with his instructions ... he has power to affect the legal relations of the principal to the same extent as if the principal had so acted." Restatement (Second) of Agency § 12 cmt. a (1958). Matson, in accordance with Hapag Lloyd's instructions, engaged BNSF to transport the engines from Chicago to Long Beach. Thus, BNSF was employed by Hapag Lloyd, even though the rail carrier dealt with Matson in arranging the shipment.
 
 
 20
 It is the nature of the relationship between Matson and Hapag Lloyd that distinguishes this case from those relied on by American Home. In each of those cases, the intermediary entity, unlike Matson, remained obligated to the carrier to perform a service that it had contracted out to a third party, whereas here, Matson's sole obligation was to arrange the transportation, not provide it. In Tokio Marine and Fire Ins. Co. v. Nippon Yusen Kaisha Lines, 466 F.Supp. 212 (W.D.Wash.1979), for instance, the applicable bill of lading extended the liability limitation to any "`servant, agent or sub-contractor of the Carrier.'" Id. at 213. The court determined that a third party was not a beneficiary of that provision, where "the carrier subcontracted its obligation to discharge the cargo in question to the Port of Seattle which in turn contracted with [the third party] to fulfill its obligation to the carrier." Id.
 
 
 21
 Similarly, in Toyomenka, Inc. v. S.S. Tosaharu Maru, 523 F.2d 518 (2d Cir. 1975), this Court refused to allow a security company hired by the stevedore, not the carrier, to benefit from a Himalaya Clause extending the liability limitation to "`all servants, agents and independent contractors... [u]sed or employed by the Carrier.'" Id. at 521 (emphasis in original). Unlike Matson, however, the stevedore was contractually obligated to provide the very same service it contracted out to the security company — protecting the goods after they had been discharged from the ship. See Toyomenka, Inc. v. S.S. Tosaharu Maru, 392 F.Supp. 450, 451 (S.D.N.Y. 1974). As such, the security company was properly deemed to be an independent contractor of the stevedore, not the carrier. See Toyomenka, 523 F.2d at 522.[4] By contrast, Matson discharged its obligations to Hapag Lloyd under the contract by engaging BNSF to transport the engines from Chicago to Long Beach. Matson was under no obligation to provide such transportation. Given that the sole purpose of the agency relationship between Matson and Hapag Lloyd was to arrange for the transportation of the engines on Hapag Lloyd's behalf, it is clear that BNSF was "employed by" Hapag Lloyd and thus entitled to limit its liability to $500 per package pursuant to the Himalaya Clause in the ECB.
 
 III. Conclusion
 
 22
 Because we conclude, albeit for different reasons, that BNSF's liability is limited to $500 per package, the judgment of the District Court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The consent judgment dismissed Danzas and Matson from the action with prejudice
 
 
 [2]
 The term Himalaya Clause is derived from the case ofAdler v. Dickson, [1955] 1 Q.B. 158 (C.A.), involving the vessel Himalaya, and is used to describe contractual provisions that extend maritime liability limitations. See Kirby, 543 U.S. at 20 n. 2, 125 S.Ct. 385. Because the liability limitation contained in COGSA only protects the primary carrier, but not the carrier's agents or other parties participating in effectuating the shipment, see Robert C. Herd & Co. v. Krawill Mach. Corp., 359 U.S. 297, 302-03, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), a Himalaya Clause is necessary to extend this limitation beyond its normal parameters, see Mikinberg v. Baltic S.S. Co., 988 F.2d 327, 332 (2d Cir.1993).
 
 
 [3]
 According to the ECB, "`Underlying Carriers'" include "any water, rail, motor, air or other carrier utilized by the Carrier for any part of the transportation of the shipment covered by this Bill of Lading."
 
 
 [4]
 Appellants also rely onLucky-Goldstar Int'l (Am.), Inc., v. S.S. California Mercury, 750 F.Supp. 141 (S.D.N.Y.1990). This case, however, simply emphasizes the importance of the nature of the relationship between the carrier and the intermediate entity in determining whether a downstream party is an intended beneficiary. In Lucky-Goldstar, an intermediate entity engaged the services of an inland rail carrier. See id. at 143. Noting that the rail carrier had failed to establish the "nature of the relationship" between the intermediate entity and the carrier and, as a result, its "position in the contractual chain," the court concluded that the rail carrier was not a subcontractor of the carrier that the Himalaya Clause was intended to protect. Id. at 146.