**In re HANDY & HARMAN REFINING GROUP and Attleboro Refining Company, Inc., Debtors.**

Nos. 00–20845, 00–20846.

United States Bankruptcy Court, D. Connecticut.

July 13, 2001.

Eric A. Henzy, Reid & Riege, P.C., Hartford, CT, for debtor.

Jed Horwitt, Zeisler & Zeisler, P.C., Bridgeport, CT, for Official Committee of Unsecured Creditors.

Patricia Beary, Carol A. Felicetta, Office of the United States Trustee, New Haven, CT, Ann M. Nevins, Assistant United States Attorney, Office of the United States Attorney, Bridgeport, CT, for United States Mint.

Harold S. Novikoff, Douglas Mayer, Wachtel, Lipton, Rosen & Katz, c/o Gregory Nye, Denise Polivy, Bingham, Dana, LLP, Hartford, CT, for Credit Suisse First Boston International.

Todd Feinsmith, Brian C. Courtney, Brown, Rudnick, Freed & Gesmer, P.C., Hartford, CT, for Fleet National Bank and Fleet Precious Metals, Inc.

## MEMORANDUM OF DECISION ON MOTION TO ESTIMATE THE CONSTRUCTIVE TRUST CLAIM OF THE UNITED STATES FOR PURPOSE OF ALLOWANCE

ROBERT L. KRECHEVSKY,
Bankruptcy Judge.

### I.

### ISSUE

The court, on May 9, 2001, issued a written ruling (the "May 9th ruling") deferring until the close of evidence a decision on the motion of Handy & Harman

Refining Group, Inc., a Chapter 11 debtor in possession ("the debtor"), filed pursuant to Bankruptcy Code § 502(c)[1] to estimate at zero the $13,474,836.55 claim of the United States Mint ("the Mint")[2] for the imposition of a constructive trust on the debtor's present bank account ("the estimation motion"). The court there concluded that a ruling on the estimation motion must await the Mint's presentation of evidence "limited to the tracing of Mint silver, or its proceeds into the present possession of the debtor." (May 9th Ruling at 10). The Mint has now presented its evidence, and the parties have submitted extensive post-hearing briefs, including proposed findings of facts and conclusions of law.

The question now before the court is whether the Mint, assuming for the purpose of the instant motion the existence of those factors for applying a constructive trust (the debtor's prepetition conversion of the Mint silver bailed to the debtor) and acknowledging that the debtor does not now possess the Mint's silver, has established a foundation for the appropriate application of the "intermediate balance rule." The Mint asserts it has, and the debtor and the Official Committee of Unsecured Creditors (together, "the movants") argue the Mint has not. The court will not repeat much of the background contained in the May 9th ruling, and that ruling should be read together with this memorandum.

## II.

### BACKGROUND

The debtor, located in South Windsor, Connecticut, together with Attleboro Refining Company, Inc. ("ARC"), its subsidiary, located in Attleboro, Massachusetts, provided refining services to customers for the recovery of precious metals from high-grade mining concentrates, and from jewelry and industrial scrap, for which they received fees. The silver the Mint, as a customer, delivered to the debtor for further refining was high-grade silver bullion.

The debtor, in general terms, either purchased from its customers the metal they delivered at some point in the refining process or, upon request by a customer, returned an equivalent amount of metal to the customer. To the extent that the debtor purchased the metals from customers, the debtor sold an equivalent amount immediately to a banking consortium headed by Credit Suisse First Boston International ("Credit Suisse") to reduce the economic risks of precious metal price fluctuations. The debtor kept track of metal transactions by maintaining for each of its approximately 400 customers a consignment ounce account which it periodically issued. If a customer delivered more than one type of metal, the debtor issued a separate consignment ounce account for each metal. Attachment A to this ruling is an example of such an account. The debtor[3], on a monthly basis, and in its annual financial statement, published "inventories" reports disclosing the precious met-

---

1. Section 502(c) provides:
 (c) There shall be estimated for purpose of allowance under this section—
 (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
 (2) any right to payment arising from a right to an equitable remedy for breach of performance.

2. The Mint is a Bureau of the Department of the Treasury of the United States of America, according to the Mint's Brief.

3. ARC did not maintain a separate precious metal inventory and all metal held by ARC was accounted for in the debtor's records.

als which the debtor had on its premises or in depositories or had sent to smelters. This report also set out the metal obligations which the debtor owed to entities such as Credit Suisse, its lender, Fleet National Bank and Fleet Precious Metal, Inc. ("Fleet"), and consignment customers. Attachment B to this ruling is an example.

The debtor's audited annual financial statements did not include precious metal inventory as an asset, and these statements specifically noted that it was the debtor's policy to own no precious metal, with the debtor holding customers' metal under assignment or bailment arrangements. Typically, the inventories report would be in balance—that is, metal the debtor possessed equaled metal it owed. The problem in the debtor's bankruptcy case is that on March 28, 2000, the petition date ("the petition date"), the debtor was insolvent and was obligated to Fleet, Credit Suisse and to customers for considerably more precious metal than was located on its premises or at other locations.

On the petition date, none of the debtor's bank accounts had a positive balance. As of April 10, 2001, the debtor's bank account contained approximately $20,000,000. The source of these funds is as follows. Approximately $10,000,000 was derived from foreign and domestic third-party smelters, to whom the debtor had sent the jewelry and scrap material for smelting, when these smelters postpetition satisfied their obligations in cash to the debtor. The debtor received approximately $800,000 from post-petition sales of certain of its realty. The balance of some $9,200,000 came either from the debtor's recovery of gold and silver which had become embedded over the years in ARC's reverberatory furnaces or in the liquidation of customer metal in the debtor's possession on the petition date. None of the customer metal that the debtor held on the petition date included the Mint's silver. The debtor had either transferred such metal to Credit Suisse, to Fleet, or prior to its petition, returned a portion to the Mint.

## III.

### *CONTENTIONS OF THE PARTIES*

#### *A.*

■■■ As noted, for the purpose of the estimation motion, the court is to assume that, except for the tracing requirement, the Mint has established the basis for the imposition of a constructive trust. "A constructive trust arises if a party clothed with some fiduciary character holds legal title to property which, equitably viewed, he ought not to hold because of fraud, duress, abuse of confidences, commission of wrong, or any form of unconscionable conduct." *In re Drexel Burnham Lambert Group*, 142 B.R. 633, 636 (S.D.N.Y. 1992) (internal citations and quotations omitted); *see also Sanyo Electric, Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*, 874 F.2d 88, 93 (2d Cir.1989) ("Where the debtor's conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions.") (quotations omitted). "It is hornbook law before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his property into a product in the hands of the wrongdoer." (May 9th Ruling at 7) (citations omitted). Since, as the Mint concedes, it cannot trace the Mint silver into the present possession of the debtor, the Mint urges the use of the intermediate balance rule to the facts established during the proceeding.

The Mint appropriately describes in its brief the intermediate balance rule as follows:

The intermediate balance rule is a fiction to deal with the problem of commingling and, specifically, to identify the property which was to have been held in trust. The bankruptcy court will follow the trust fund or property and decree restitution where the amount of the deposit at all times since the intermingling of funds or property equaled or exceeded the amount of the trust funds. [The rule provides] a presumption that if funds are withdrawn from an account composed partially of trust funds and partially of other funds, for a nontrust purpose the nontrust funds are deemed transferred first and the trust funds last. (Citations and internal quotation marks omitted.)

(Mint Brief at 17–18.)

The Mint theorizes that the debtor, by delivering to each metal customer a consignment ounce statement (Attachment A), and by establishing a balance sheet of precious metal (Attachment B), has maintained a "Metal Pool" of property which is a "nearly perfect" analogy to that of a bank account. (Mint Brief at 24). The Mint claims that its silver "became part of the [debtor] Metal Pool prior to the Petition Date." (*Id.* at 26). The movants and the Mint have stipulated that the amount of silver in the Metal Pool never fell below the amount of silver underlying the Mint's claim. The Mint concludes: "Accordingly, the Mint has established all elements required for imposition of the intermediate balance rule against the cash proceeds of [debtor's] Metal Pool." (*Id.*).

### B.

The movants deny that the Mint's theory of tracing has merit. The movants first contend that, assuming the Mint's silver became part of a Metal Pool when received, the Mint's silver did not remain in the Metal Pool, as it was undeniably transferred to Credit Suisse, Fleet, or, in part, returned to the Mint. The movants cite *Salisbury Inv. Co. v. Irving Trust Co. (In re United Cigar Stores Co.),* 70 F.2d 313, 316 (2d Cir.1934) (emphasis added by movants):

When a trustee commingles trust funds with other monies in a single account, the lowest intermediate balance rule aids beneficiaries in tracing trust property. The lowest intermediate balance rule, a legal construct, allows trust beneficiaries to assume that trust funds are withdrawn last from commingled accounts. *Once trust money is removed, however, it is not replenished by subsequent deposits.* Therefore, the lowest intermediate balance in a commingled account represents trust funds that have never been dissipated and which are reasonably identifiable.

The movants next deny the existence of an account to which the intermediate balance rule could apply. The Metal Pool described by the Mint did not consist only of silver, but of many different precious metals, all of which were in various stages of refining, none of it owned by the debtor, and included accounts receivable from third-party smelters located around the world. The movants assert the debtor in its consignment ounce statements did not represent that such metal was on hand, only an amount of metal that the debtor, at some later time, would either purchase or return in kind to the customer.

Lastly, the movants contend that even if a Metal Pool could be found to exist, the Mint concedes that none of the precious metal in the Metal Pool belonged to the debtor—the metal belonged to customers only. The movants cites 5 Austin W. Scott & William F. Fratcher, *The Law*

*of Trusts* § 519 (4th ed. 1989): "Where a wrongdoer commingles the money of two or more persons without contributing any money of his own, the claimants have an interest in the mingled fund in proportion to their contributions to the fund." The debtor's liquidating plan of reorganization proposes to treat all metal customers' claims equally, with a pro rata distribution of the debtor's assets.

### C.

■ The parties are in agreement that the Mint, as the party asserting the existence of a constructive trust, bears the burden of proof that the trust exists and that the property, which is the subject of the trust, can be traced. *See In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1063 (3d Cir.1993), *cert. denied*, 501 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994).

### IV.

### *DISCUSSION*

### A.

■ If, solely for the purpose of the issue at hand, the court were to accept the Mint's premise that the debtor maintained a Metal Pool account comprised of bailed metal of hundreds of customers (including the Mint) and that $19,200,000 presently held in the debtor's bank account included the proceeds of the sale of such metal, the Mint could still not establish the circumstances necessary for the imposition of a constructive trust on the Metal Pool account, or the debtor's subsequent bank account. This is because, under the Mint's own theory, the funds at issue would be not property of the debtor, but property of all consignor or bailor customers. In other words, under the Mint's theory, inasmuch as all of the metal previously held in the Metal Pool account was property upon which a constructive trust could be im-

posed, none of the proceeds of such property, presently held in the debtor's bank account, in equity constitutes non-trust funds.

■ The intermediate balance rule is applicable only to situations where trust funds are commingled with non-trust funds; it presumes that any withdrawals are made first against the non-trust funds. Such a presumption is meaningless when there are no or inconsequential non-trust funds in the account. "The rule is useful to work out equity between a wrongdoer and a victim; but, when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the case is different. To say that, as between equally innocent victims, the wrongdoer, having defeasible title to the whole fund, must be presumed to have distinguished in advance [between the funds attributable to the Mint's metal and those attributable to the metal of the other metal customers] would be carrying the fiction to a fantastic conclusion." *Cunningham v. Brown*, 265 U.S. 1, 13, 44 S.Ct. 424, 427, 68 L.Ed. 873 (1924).

### B.

### *Policy Considerations*

The Mint concedes that to grant it a constructive trust, insofar as other estate creditors are concerned, "is harsh." (Mint Brief at 30–31 (The granting of the constructive trust which results in "depletion of the pool of assets to distribute to businesses and individuals who did nothing wrong—is harsh.")) *Cf. In re Omegas Group, Inc.*, 16 F.3d 1443, 1452 (6th Cir. 1994) ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate and thus directly from competing creditors, not from the offending debtor.").

The justification submitted by the Mint for this court to order such a "harsh" result is "the Mint's status as a federal government bureau" where the Mint is prohibited from disposing of silver without Congressional authority. (Mint Brief at 27.) The Mint argues that for this court "[t]o rule otherwise will establish a precedent that government property may be converted by a dishonest debtor and a subsequent bankruptcy filing." (*Id.* at 30.)

The court concludes such argument is unavailing since the Mint's claims for a special status as a government entity in this instance is contrary to an equity court's duty to keep the playing field level. Congress is well aware of its power to grant priorities. *Cf.* Bankruptcy Code § 507(a)(8) (granting governments priority over general creditors for certain taxes and customs duties). It has not done so for converted government property, and a court cannot and should not do so by judicial fiat.

## V.

### CONCLUSION

The court concludes that the Mint has not met its burden of proof for the imposition of a constructive trust.[4] "If they were unable to carry the burden of identifying the fund as representing the proceeds of their [property], their claim must fail. If their evidence left the matter of identification in doubt, the doubt must be resolved in favor of the [debtor in possession], who represents all of the creditors of [the debtor], some of whom appear to have suffered in the same way. Like them, the appellants must be remitted to the general fund." *Schuyler v. Littlefield,* 232 U.S. 707, 713, 34 S.Ct. 466, 58 L.Ed. 806 (1914). The debtor's motion to estimate the constructive trust claim of the Mint at zero for the purpose of allowance is granted.[5] It is

SO ORDERED.

ATTACHMENT "A"

Page 1

US MINT 000914
PROCUREMENT DIVISION
633 3RD STREET NW
WASHINGTON DC USA 20220

000914

Period 01/01/2000 to 03/28/2000

**4.** As one court commented:

Just as medieval alchemists bent all their energies to discovering a formula that would transmute dross into gold, so too do modern creditors' lawyers spend prodigious amounts of time and effort seeking to convert their clients' general, unsecured claims against a bankrupt debtor into something more substantial. The creditor's lawyer in this case achieved success in this regard that can only be described as phenomenal, transforming the lead of a breach of contract claim into the gold of a constructive trust and, in turn, into the platinum of cash when it turned out that the real property on which the trust was belatedly to be imposed had been sold. Under our Bankruptcy Code, such sorcery demands the highest attention to the requirements of pleading and proof by its practitioner. Because those requirements were not met, we are required to reverse in part the decision of the court below.
*Haber Oil Co., Inc. v. Swinehart (In re Haber Oil Co., Inc.),* 12 F.3d 426, 430–31 (5th Cir. 1994).

**5.** The Mint seeks a favorable ruling at this time on its pending motion to estimate its proof of claim for voting purposes. That motion is yet to be addressed.

Fine SILVER Consignment Ozs .
Contract 00000

| Date Avail. | | | Debit | Credit | |
|---|---|---|---|---|---|
| | | | | Previous Balance | 136,128.420CR |
| 01/25/2000 | 34058 | SHP | 195,799.635 | | |
| | | | | | 59,671.215DR |
| 01/28/2000 | 16691 | REF | | 524,030.190 | |
| 01/28/2000 | 16692 | REF | | 522,283.290 | |
| 01/28/2000 | 16693 | REF | | 520,054.950 | |
| 01/28/2000 | 16709 | REF | | 532,857.400 | |
| 01/28/2000 | 16710 | REF | | 525,966.220 | |
| 01/28/2000 | 16740 | REF | | 550,455.790 | |
| | | | | | 3,115,976.625CR |
| 02/29/2000 | 34211 | SHP | 509,550.800 | | |
| | | | | | 2,606,425.825CR |
| 03/07/2000 | 34278 | SHP | 505,538.460 | | |
| | | | | | 2,100,887.365CR |
| 03/23/2000 | 34355 | SHP | 506,459.850 | | |
| | | | | Ending Balance | 1,594,427.515CR |

**32**

ATTACHMENT "B"

FEB. 25. 2000 11:19AM EXRG 80000774:

DRAFT FOR DISCUSSION ONLY NOT EXTERNALLY REVIEWED

WLJM
01/23/00