## In re HANDY & HARMAN REFINING GROUP, INC., Attleboro Refining Company, Inc., Debtors.

### United States of America, Plaintiff,

v.

### Fleet National Bank and Fleet Precious Metals, Inc., Handy & Harman Refining Group, Inc., Attleboro Refining Company, Inc., Credit Suisse First Boston International, Defendants.

### United States of America, Plaintiff,

v.

### Credit Suisse First Boston International; Fleet National Bank; Fleet Precious Metals, Inc.; Bayerische Hypo–Und Vereinsbank, AG; Royal Bank of Canada; N.M. Rothschild & Sons Ltd.; Handy & Harman Refining Group, Inc.; and Attleboro Refining Company, Inc., Defendants.

Bankruptcy Nos. 00–20845, 00–20846.
Adversary Nos. 01–2026, 01–2027.

United States Bankruptcy Court,
D. Connecticut.

Dec. 27, 2001.

Ann M. Nevins, Assistant U.S. Attorney, United States Attorney's Office, Bridgeport, CT, for Plaintiff.

Todd A. Feinsmith, Elise Busny, Brian C. Courtney, Brown, Rudnick, Freed & Gesmer, P.C., Hartford, CT, for Fleet National Bank and Fleet Precious Metals, Inc.

Eric A. Henzy, Dominic Fulco III, Robert C. Reichert, Reid and Riege, P.C., Hartford, CT, Jed Horwitt, Stephen M. Kindseth, Zeisler & Zeisler, P.C., Bridgeport, CT, Co–Counsel for Handy & Harman Refining Group, Inc. and Attleboro Refining Company, Inc.

Gregory W. Nye, Susan Kim, Bingham Dana LLP, Harold S. Novikoff, Douglas K. Mayer, Wachtell, Lipton, Rosen & Katz, c/o Bingham Dana LLP, Hartford, CT, Co–Counsel for Credit Suisse First Boston International, Bayerische Hypo–Und Vereinsbank, AG, Royal Bank of Canada, N.M. Rothschild & Sons Ltd.

*RULING DENYING MOTIONS FOR PARTIAL SUMMARY JUDGMENT*

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

I.

The United States of America, acting on behalf of the United States Mint ("the Mint"), on May 7, 2001, filed two amended complaints ("the complaint" or "the complaints") in the jointly-administered Chapter 11 cases of Handy & Harman Refining Group, Inc. ("HHRG") and Attleboro Refining Company, Inc. ("ARC"). One complaint contains twelve counts against five defendants—Fleet National Bank and Fleet Precious Metals, Inc. (together, "Fleet"), HHRG, ARC and Credit Suisse First Boston International ("Credit Suisse"). The other complaint contains ten counts against eight defendants— HHRG, ARC, and six members of a banking syndicate (collectively, "the Banking Syndicate") which comprises Credit Suisse, Fleet, Bayerische Hypo–Und Vereinsbank, AG, Royal Bank of Canada, and N.M. Rothschild & Sons Ltd. HHRG and its wholly-owned subsidiary, ARC, are metal refining companies. Fleet and the Banking Syndicate are financial institutions which, in various ways, had funded HHRG's and ARC's business operations.[1]

Prepetition, on March 25, 1999, the Mint and HHRG entered into a contract ("the Contract") for the refining by HHRG of 8,000,000 ounces of contaminated silver bullion delivered to it by the Mint. HHRG agreed to refine this bullion to 99.95% pure silver and 90.0% silver and 10% copper for a price of nine cents and seventeen cents per ounce respectively. In November 1999, HHRG and the Mint modified the Contract to increase the amount of silver bullion to be refined to approximately 16,000,000 ounces. When, on March 28, 2000, HHRG and ARC filed their bankruptcy petitions (and subsequently ceased operation), HHRG had insufficient silver on hand to satisfy its 400 customers. *See In re Handy & Harman Refining Group*, 266 B.R. 24, 27 (Bankr.D.Conn.2001). On the petition date, HHRG either owed or failed to return to the Mint 2,660,382.34 ounces of silver.

In certain counts of the complaints ("the bailment counts"), the Mint seeks damages based upon its allegation that the terms of the Contract created a bailment[2] of the silver bullion that the Mint delivered to HHRG for refining. Accordingly, the bailment counts aver, that when HHRG and ARC wrongfully caused the Mint-owned silver to be transferred and/or sold to Fleet and the Banking Syndicate, all defendants became liable to the Mint for the value of such silver. HHRG has filed a motion for partial summary judgment as to the bailment counts in each complaint ("the motions").[3] HHRG contends in the motions that the Contract provides, not for a bailment of the Mint-furnished silver bullion, but for a sale of refined silver from

---

1. The Mint alleges that Credit Suisse is the lead member of the Banking Syndicate.

2. "A relationship of bailor-bailee arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods where the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions." *B.A. Ballou & Co. v. Citytrust*, 218 Conn. 749, 753, 591 A.2d 126 (1991) (Internal quotation marks omitted.)

3. In Adversary Proceeding No. 01–2026, the motion is as to counts one, two, eight, nine, ten, eleven and twelve. Counts six and seven were withdrawn. In Adversary Proceeding No. 01–2027, the motion is as to counts one, two, six, seven, and ten. Counts eight and nine were withdrawn.

HHRG to the Mint, thereby making the conceded transfers or sales not per se Contract violations.[4] The Mint opposes the motions on numerous grounds, but only its initial objection—that there exists genuine issues of material fact as to the intentions of the contracting parties—need be addressed.[5]

## II.

### A.

HHRG, to support its motions, submitted the Contract, its analysis of the Contract provisions, and a concession that HHRG had transferred the Mint-furnished silver to Fleet and the Banking Syndicate. The Mint, in opposition to the motions, submitted a counter analysis of the Contract and affidavits of Robert A. Campbell, the Mint's Contracting Officer who executed the Contract. The affidavits are to the effect that, *inter alia*, the Contract did not involve a sale of silver bullion to HHRG, and that it was not the Mint's intention that HHRG would take title to the silver bullion once it was delivered to HHRG by the Mint.

The Contract, which is twenty-one pages long, plus attachments, contains no clear statements as to whether a bailment or a sale of the silver was intended. Attached to this ruling are Contract Sections H.23, upon which HHRG largely relies, and I.1, which the Mint cites, in advancing their respective arguments.

### B.

In support of its argument that a sale of the refined silver was intended, HHRG notes that in Section H.23, the Contract "required [HHRG] to warrant clear title in the refined silver to the Mint, and specifically delineated when title would pass from [HHRG] to the Mint." (HHRG's Br. at 3.) HHRG concludes that a provision for the passage of title from HHRG to the Mint indicates that the parties contemplated a sale by HHRG to the Mint of refined silver. HHRG further notes that the language in Section H.23(b) referred to "conditions of sale," and that the Contract elsewhere provided that the deliveries of refined silver be "FOB Origin." HHRG contends that according to Article 2 of the Uniform Commercial Code, this sort of arrangement indicates that the seller, in this case HHRG, had a duty to ship the goods and bear the expense and risk of loss until it reached the point of origin, whereupon title to the goods was to pass from the seller, HHRG, to the buyer, the Mint. Finally, HHRG contends that the Contract did not create a bailment arrangement in light of the sale language in the Contract, the lack of any requirement that HHRG return the identical silver that the Mint furnished for refining, and the omission of any bailment language in the Contract.

In opposing the motions, the Mint asserts that there are genuine issues of material fact, and submits that the Contract represents a bailment agreement and not a sales agreement. The Mint asserts that the Contract language in Section I.1 provided for a bailment when it required that the Mint deliver its contaminated silver to HHRG, that HHRG refine the silver, and that HHRG return the Mint-furnished silver back to the Mint. The Mint contends that the Contract also provided that HHRG must maintain insurance covering the Mint's silver for 150% of its value with

---

**4.** HHRG and the Mint agree that the Mint holds a valid breach of contract claim against HHRG's bankruptcy estate of $13,474,836.56, subject only to possible offsets.

**5.** Because the respective amended complaints and motions for partial summary judgment concern essentially identical facts and arguments, this ruling addresses both motions.

the Mint being the named beneficiary under the policy. Moreover, if HHRG failed to maintain insurance on the silver, the Contract stated that the Mint could then terminate the Contract and obtain all of the Mint-furnished silver from HHRG. The Mint notes that there is no language in the Contract referring to a sale price or a sale, that the Contract described only the refining services that HHRG must perform for a fee, and that the language of "clear title" in Section 11.23(c) is not a reference to the silver, but concerned the copper that HHRG would utilize in the process of refining a portion of the Mint-furnished silver to 90% purity with a 10% copper content.

## III.

### A.

■ Summary judgment is not proper unless no genuine issue of material fact exists, and unless the undisputed facts mandate judgment for the movant as a matter of law. *See* Fed.R.Civ.P. 56(c); *I.V. Serv. of America v. Trustees of American Consulting Engineers*, 136 F.3d 114, 119 (2d Cir.1998). "In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *Duse v. International Business Machines Corporation*, 252 F.3d 151, 158 (2d Cir.2001). "Summary judgment is appropriate only when the language of a contract is 'wholly unambiguous.'" *Schiavone v. Pearce*, 79 F.3d 248, 252 (2d Cir. 1996). "The question of whether contract language is plain or ambiguous is to be determined by the court as a matter of law." *Id.*

### B.

■ The issue of whether a contract represents a bailment or a sale is not an uncommon problem in industries, such as refining, where a company must make arrangements with another entity to process its raw materials. *See* William D. Harrington, *A Caveat for Commodity Processing Industries: Insolvent Processors' Creditors vs. Putative Owners of Raw Material*, 16 UCC L.J. 322 (1984) (noting how arrangements in the commodity processing industries, such as grain, crude oil, and precious metals, often include attributes of both bailments and sales, leaving the courts with the task of interpreting the parties' intentions). *See also* James J. White & Robert S. Summers, *Quasi Consignment*, 4 Uniform Commercial Code § 30–5 (4th Ed.1995) (discussing the recent litigation over whether agreements for processing are bailments).

Courts dealing with contracts having both bailment and sale characteristics look beyond the four corners of the contract and examine the various circumstances that led to the contractual arrangement. *See e.g., In re Sitkin Smelting & Refining, Inc.*, 639 F.2d 1213, 1217 (5th Cir.1981) (concluding that a contract to process film waste was a bailment after considering the contract language, how the waste was stored, the circumstances of the parties, and whether the parties listed the waste as inventory in their bookkeeping); *In re Sitkin Smelting & Refining, Inc.*, 648 F.2d 252, 254 (5th Cir.1981) (concluding that a contract to refine scrap metal was a sale and not a bailment after considering the contract language and the surrounding circumstances of the parties); *In re Medomak Canning Co.*, 1977 WL 25603, at *4–8 (Bankr.D.Me.), *aff'd* 588 F.2d 818 (1st Cir. 1978) (concluding a bailment was intended when a food producer supplied ingredients, packaging, and shipping materials, and the debtor contracted to process and package the ingredients into a final product. The

court, after examining the contract language and finding that it contained both bailment and sale language, proceeded to consider evidence of pre-contract negotiations, the accounting records of both parties, the business structure and financial capabilities of each party, the initial drafts of the contract, and the needs and interests of both parties.).

### C.

■ In the instant proceedings, the court, after examining the Contract and finding both language of bailment and sale, concludes that the Contract is ambiguous, and, therefore, inappropriate for summary judgment. *See Alicea v. Empire Blue Cross and Blue Shield*, 274 F.3d 90, 98 (2d Cir.2001) (concluding that summary judgment entered by the trial court was inappropriate because the documents at issue were ambiguous, the circuit court instructed the trial court "to allow the parties to present extrinsic evidence concerning the meaning of [the] ambiguous provisions."). "If the language is susceptible to different reasonable interpretations, and where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact precluding summary judgment." *Sayers v. Rochester Telephone Corp.*, 7 F.3d 1091, 1094 (2d Cir.1993) (Internal quotation marks omitted.) A decision by this court as to whether the parties agreed to a bailment or a sale requires the court to consider evidence outside the Contract to resolve the Contract's ambiguous language. There exists issues of material fact with respect to what the parties intended in the Contract. The motions for partial summary judgment must be denied.

### IV.

### *CONCLUSION*

For the foregoing reasons, HHRG's respective motions for partial summary judg-ment as to counts one, two, eight, nine, ten, eleven, and twelve in Adversary Proceeding No. 01–2026, and counts one, two, six, seven, and ten in Adversary Proceeding No. 01–2027 are denied. It is

SO ORDERED.

### ATTACHMENT

### H.23 WARRANTIES AND REPRESENTATIONS *(JUN 1998)*

a) In addition to any standard commercial warranty provided by the Contractor, Contractor warrants that the goods and/or services comply with all requirements of this contract and are free from defects in workmanship for a period of three years after acceptance. Latent defects shall be corrected by the Contractor, notwithstanding the period of the warranty. Failure of the Contractor to correct latent defects shall entitle the Mint to correct the latent defect or replace the equipment or supplies and charge the Contractor accordingly.

b) Contractor warrants and represents that all information provided by the Contractor to the Mint is and will be true and correct. Contractor further warrants and represents the goods and/or services delivered do not infringe upon any copyright, trademark or patent right found in Federal or state law and that all goods and/or services delivered or provided under this contract were manufactured or provided in compliance with United States law and regulations and any applicable local law. Contractor acknowledges that in entering into this agreement, the Mint has specifically relied upon the warranties and representations contained herein. All warranties and representations of Contractor, both express and implied, shall constitute conditions of sale and shall survive inspection, testing, acceptance, payment and use.

c) For goods delivered under this contract, Contractor warrants clear title to all goods and, upon delivery, acceptance and payment by the Mint, title shall pass to the Mint free and clear of all liens, claims, debts and rights of any third party. Contractor warrants and represents the goods are new, genuine and are not falsely labeled.

d) The Mint shall give the Contractor notice of any defects or breach of any warranty or representation. At the Mint's option the Mint may 1) have the Contractor correct any defects in the goods and/or services at no cost 2) correct or replace the defective goods or services with similar goods and/or services and charge the Contractor the cost of repair or replacement or 3) make an equitable adjustment to the contract price. Any goods or services corrected by the Contractor shall be subject to this clause to the same extent as goods/services initially provided or performed. In addition, the contractor will be liable for any and all other foreseeable consequential damages, including but not limited to, damages for injuries caused by defective goods or services.

## I.1 MINT–FURNISHED PROPERTY
(Clause # I–050, Mar 1996)

The Mint shall furnish for the Contractor's use, at the time and location(s) stated in this contract, the following Mint-furnished property (MFP):

Bars of 999 silver with varying degrees of contamination to be refined to remove the contaminates.

If that property, suitable for its intended use, is not delivered to the Contractor, the Contracting Officer shall equitably adjust affected provisions of this contract in accordance with the changes clause when the facts warrant an equitable adjustment.

The Contractor shall use MFP only in connection with this contract, assume the risk for loss or damage, and return the MFP to the Mint refined silver per specifications in Section C.