**In re HANDY & HARMAN REFINING GROUP, INC., and Attleboro Refining Company, Inc., Debtors.**

**Chain Technology, Inc., Plaintiff,**

**v.**

**Fleet National Bank, Fleet Precious Metals, Inc., Defendants.**

**Bankruptcy Nos. 00–20845, 00–20846. Adversary No. 01–2001.**

United States Bankruptcy Court, D. Connecticut.

May 16, 2003.

---

Douglas S. Skalka, Esq., Nancy Bohan Kinsella, Esq., and James A. Lenes, Esq., Neubert, Pepe & Monteith, P.C., New Haven, CT, for Plaintiff.

Todd A. Feinsmith, Esq., Cheryl B. Pinarchick, Esq., and Samantha L. Gerlovin, Esq., Brown, Rudnick, Berlack, Israels, LLP, Hartford, CT, for Defendants.

## *INTERLOCUTORY RULING PARTIALLY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

ROBERT L. KRECHEVSKY,
Bankruptcy Judge.

## I.

## *ISSUES*

### *A.*

The issues before the court, in general, involve the recondite area of secured financing in the precious metals industry and, in particular, the parties' responsibilities where the same lender finances the operations of a precious metal refinery and the refinery's customers.

*B.*

Chain Technology, Inc. ("Chain"),[1] on January 3, 2001, filed a six-count complaint against Fleet National Bank and Fleet Precious Metals, Inc. (together, "Fleet")[2] alleging as causes of action Fleet's breach of fiduciary duty as a lender to Chain (First Count); Fleet's failure, as a lender, in its duty to disclose required information to Chain (Second Count); Fleet's negligence in preserving Chain's collateral (Third Count); Fleet's breach of its loan agreement with Chain (Fourth Count); Fleet's breach of an implied covenant of good faith and fair dealing (Fifth Count); and Fleet's violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42–110a *et seq.* (2000 & Supp. 2003) (Sixth Count).[3]

Chain and Fleet are both creditors in the liquidating Chapter 11 case of Handy & Harman Refining Group, Inc. ("HHRG"), filed on March 28, 2000, and being jointly administered with the Chapter 11 case of Attleboro Refining Company, Inc. ("Attleboro"). HHRG, together with Attleboro, one of the world's largest precious metal refineries, is located in South Windsor, Connecticut. Attleboro is HHRG's wholly-owned subsidiary. Fleet, on January 13, 2003, filed a motion for summary judgment ("the motion" or "Fleet's motion") on all counts of the complaint in its favor contending there are no genuine issues as to any material fact and Fleet is entitled to judgment as a matter of law. Chain opposes the motion asserting that genuine issues of material fact exist and that Fleet is not entitled to judgment on any count.

## II.

### BACKGROUND

*A.*

Chain, located in Rhode Island, was in the business of manufacturing gold chains and other jewelry. Chain and Fleet, on May 20, 1998, entered into an agreement entitled "Consignment Agreement"("the Chain–Fleet Agreement") under which Fleet agreed to consign to Chain gold bullion bars or bags of gold grain up to a value of $2,000,000 for use in Chain's operations. Chain agreed to insure the gold, accept all risk of loss, with title of the gold to remain with Fleet until the gold was paid for by Chain, whereupon title would then pass to Chain. Until purchase, Chain granted Fleet a security interest in the gold and furnished Fleet with a bank letter of credit for $1,500,000 and certificates of deposit totaling $600,000 to secure further Chain's obligations under the Chain–Fleet Agreement. Chain, at some point, began sending the bullion gold received from Fleet to HHRG for refining into gold grain. HHRG and Fleet, on August 15, 1996, had entered into an agreement entitled "Loan and Consignment Agreement" ("the HHRG–Fleet Agreement") under

---

1. Although nothing on the face of the complaint so indicates, Chain is a debtor whose Chapter 7 case is presently pending in the Rhode Island Bankruptcy Court, converted on March 28, 2001 from a Chapter 11 case originally filed on April 19, 2000. The present action is being prosecuted by Chain's Chapter 7 trustee, Stacey Ferrara. (Chain's Mem. at 5.)

2. The parties throughout their memoranda treat the two defendants as a single entity, and the court will do the same.

3. The propriety of the court to hear certain creditor claims against Fleet was established by a court order entered on May 16, 2000 ("the Cash Collateral Order"). In their initial Fed.R.Civ.P. 26(f) report, Chain and Fleet stipulated that the complaint commenced a non-core proceeding under 28 U.S.C. § 157 as to which the parties have not consented to the entry of final orders.

which Fleet consigned precious metals to and provided financing for HHRG. HHRG granted Fleet a security interest in such metals and, in addition, in all of HHRG's assets. In the Cash Collateral Order, *see supra* note 3, HHRG represented to the court that customers, such as Chain, did not retain ownership interests in the precious metals delivered to HHRG for refining; that these metals were not delivered under bailment agreements; that no UCC–1 financing statements were filed; that such metals were commingled during the refining process so that identification of the metals' sources was impossible; and that the metals constituted Fleet's collateral under the HHRG–Fleet Agreement.

In connection with the Chain–Fleet Agreement, the status of transactions between these parties was maintained on a Consignment Account ("the Consignment Account"). Some of Chain's customers also maintained like accounts with Fleet, and such customers would have gold transferred into Chain's Consignment Account in payment for goods provided them by Chain.

Somewhat similarly, when an HHRG customer, like Chain, sent precious metals to HHRG for further refining, HHRG maintained a Pool Account ("Pool Account") for each customer showing the amounts of gold received from and sent to each customer. Chain routinely ordered Fleet to transfer gold bullion from the Consignment Account into the Pool Account, which Fleet did in accordance with Chain's instructions.[4]

## B.

In late 1999 or early 2000, Fleet learned from HHRG that HHRG was experiencing difficulty getting precious metal into the United States, which it was allegedly collecting in South America, and that questions had arisen as to whether such metal, in fact, existed. After Fleet was advised by HHRG's owner that precious metals, valued at $12,000,000, was missing and would not be replaced, Fleet, on or about March 8, 2000, sent HHRG a notice of default and accelerated HHRG's debt. Chain, unaware of HHRG's financial difficulties, had, between March 10, 2000 and March 14, 2000, ordered Fleet to transfer approximately 949.943 ounces of gold[5] from its Fleet Consignment Account into its HHRG Pool Account ("the gold transfers"). During this period, Fleet did not communicate to Chain any information concerning HHRG's financial difficulties.

Due to HHRG's insolvency and bankruptcy filing, HHRG did not return to Chain any of the gold in Chain's Pool Account,[6] causing Chain to default under provisions of the Chain–Fleet Agreement. Fleet requested that Chain return the gold consigned to it under the Chain–Fleet Agreement, which Chain refused to do. Fleet, on April 10, 2000, terminated the Chain–Fleet Agreement and proceeded to satisfy fully Chain's obligations to it by realizing on the bank letter of credit and the certificates of deposit. As noted, Chain had filed its own bankruptcy petition on April 19, 2000. *See supra* note 1. Additional facts will be provided as

---

4. See *In re Handy & Harman Refining Group, Inc.,* 262 B.R. 211 (Bankr.D.Conn.2001) and 266 B.R. 24 (Bankr.D.Conn.2001) for further background on HHRG's methods of functioning, examples of pool accounts and HHRG's book treatment of metals deposited with it for refining operations by its approximately 400 customers.

5. Chain claims the market value of this gold was approximately $275,000.

6. On the date of the filing of its bankruptcy petition, HHRG had considerably less precious metals on hand than it owed to its customers.

deemed necessary for the court's ruling on each count.

## III.

### SUMMARY JUDGMENT STANDARDS

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c), made applicable by Fed. R. Bankr.P. 7056. "The moving party ha[s] the burden of proving that no material facts are in dispute, and in considering such a motion, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. The court in deciding a summary judgment motion, cannot try issues of fact, but can only determine whether there are issues of fact to be tried." *Hirsch v. Cahill (In re Colonial Realty Company)*, 210 B.R. 921, 923 (Bankr.D.Conn.1997) (citations and internal quotation marks omitted). Once the moving party meets its burden, "the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists." *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2nd Cir.1993) (citation and internal quotation marks omitted).

## IV.

### CHOICE OF LAW

The parties have chosen to avoid any choice of law issue by each agreeing in their respective memoranda to cite to both Rhode Island and Connecticut law, and conceding that the law of each state is so similar that the court need not determine which state law governs the complaint's first five counts. The court, accordingly, will not make any choice of law determination.

## V.

### FIRST COUNT

#### A.

Chain asserts in this count that Fleet "breached its fiduciary duties to [Chain]" when Fleet transferred gold to the Pool Account "despite its knowledge that [HHRG] had recently suffered a substantial loss of precious metals in the amount of approximately $12,000,000.00 and despite its knowledge that it had declared [HHRG] in default under [HHRG's] Fleet Loans." (Compl. ¶'s 18, 20.) Fleet submits that Chain's response to the motion cannot reasonably support a finding that a fiduciary relationship existed between Fleet and Chain, and, accordingly, that summary judgment in favor of Fleet is warranted.

Although Chain does not dispute Fleet's contention that the existence of a lender-borrower relationship does not, in and of itself, create a fiduciary relationship,[7] Chain relies upon the following additional allegations of exceptional circumstances to establish the existence of a fiduciary relationship. Chain's president, Steven J. Iacono ("Iacono"), in his deposition, testified to an asserted fiduciary relationship between Chain and Fleet based upon his periodic conversations with Edward Gately ("Gately"), Fleet's vice-president. These conversations occurred at trade shows a

---

**7.** *See Santucci v. Citizens Bank of Rhode Island*, 799 A.2d 254, 258 (R.I.2002) (noting that "a depositor relationship does not in and of itself give rise to a fiduciary relationship"); *Southbridge Associates, LLC v. Garofalo*, 53 Conn.App. 11, 19, 728 A.2d 1114, *cert. denied*, 249 Conn. 919, 733 A.2d 229 (1999) ("Generally there exists no fiduciary relationship merely by virtue of a borrower lender relationship between a bank and its customer.")

few times a year and, on occasion, when he called Gately on the phone.

- Gately provided financial advice to Chain "in the form of the precious metals market."

- Gately provided Iacono with "an indication of just overall where [Fleet] felt the [precious metals] market was going to be, where the [precious metals] lease rates would be, you know, try to project out to the future, to help us make decisions . . . ."

- Gately would explain provisions in the Consignment Agreement, "but more importantly, [he would explain] business type questions, the market, you know, where it was going, what did they think, what rates were they able to lock in at . . . ."

- Iacono "relied a lot upon what Fleet said. They were the biggest in the precious metals business at that time. . . . So I would look to Fleet as more of the expert, and, certainly, Ed [Gately] being the head person in the department, I would think that he would have his finger on the pulse as being his responsibility. So I would rely on his advice or whatever he might have suggested."

- Fleet informed Chain of the opportunity to have gold refined into grain for .50 cents per ounce with Handy & Harman as compared to .75 cents per ounce or one dollar per ounce that Fleet charged. Chain acted on this advice from Fleet and was able to save .50 per ounce on grain. Since Chain used about 200,000 ounce of grain per year prior to its closure, this financial advice represented a potential savings of about $100,000 per year.

(Chain Mem. at 11, 12.) (Citations omitted.) Chain asserts, based upon this testimony, "Fleet owed Chain a fiduciary duty." *Id.*

*B.*

■ "A fiduciary relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interest of the other." *Southbridge Associates,* 53 Conn.App. at 18, 728 A.2d 1114 (internal quotation marks omitted); *see also In re Belmont Realty Corp.,* 11 F.3d 1092, 1101 (1st Cir.1993) (describing Rhode Island law on fiduciaries which considers: (1) the reliance of one party upon the other; (2) the relationship of the parties prior to the incident complained of; (3) the relative business capacities or lack thereof between the parties; and (4) the readiness of one party to follow the other's guidance in a complicated transaction). In examining a relationship between a bank and a borrower, "[a] fiduciary relationship may arise where there is a long history of dealings between the [borrower] and the bank, and where the bank acts as the [borrower's] financial advisor . . . or where the bank gains the confidence of the borrower and purports to act or advise with the borrower's interest in mind." *Dime Savings Bank v. Lombardi,* No. CV 950145967S, 1996 WL 278346, at *2 (Conn.Super. May 7, 1996).

*C.*

■ The court concludes that Chain has submitted sufficient probative evidence to satisfy its obligation to show that an issue of fact exists as to whether Fleet owed Chain a fiduciary duty. While the conversations between Iacono and Gately may not, by themselves, have given rise to a fiduciary relationship, when the additional circumstance of Fleet being involved with Chain sending gold to HHRG, and such gold thereby becoming subject to Fleet's security interest, a reasonable fact finder may determine Fleet owed a fiduciary

duty to Chain. As noted in Section III, the court, in ruling on a summary judgment motion, does not try issues of fact, but only determines if the party opposing the motion has produced probative evidence to support the view that a genuine factual dispute exists. Fleet's motion as to the First Count is denied.

## VI.

### *SECOND COUNT*

#### *A.*

The Second Count asserts liability against Fleet based upon Fleet's "duty to [Chain] to disclose its knowledge of the financial status of [HHRG] before carrying out the [gold] transfers." Fleet knew or should have known that its failure to disclose said information to [Chain] would result in a substantial loss to [Chain]. (Compl.¶¶ 20–21.). Fleet argues it is entitled to summary judgment because no duty to disclose existed and that, as a matter of law, banks have a duty to keep their customer's financial information confidential.

In addressing the issue of a bank's duty to disclose *vel non,* both Connecticut and Rhode Island case law[8] have cited to the Florida Supreme Court ruling in *Barnett Bank of West Florida v. Hooper,* 498 So.2d 923 (Fla.1986). *Hooper* held:

> [W]here a bank becomes involved in a transaction with a customer with whom it has established a relationship of trust and confidence, and it is a transaction from which the bank is likely to benefit at the customer's expense, the bank may be found to have assumed a duty to

disclose facts material to the transaction, peculiarly within its knowledge, and not otherwise available to the customer. Where the bank defends its breach of duty on the ground that it owes a conflicting duty of confidentiality to a second customer, the jury is entitled to weigh the one duty against the other.

498 So.2d at 925.

#### *B.*

The court's conclusions as to the First Count apply as well to the Second Count. Under *Hooper,* Fleet's obligation to HHRG to keep financial information confidential was not absolute, and a genuine factual issue exists on Fleet's duty to disclose. The motion as to the Second Count is denied.

## VII.

### *THIRD COUNT*

Chain alleges that Fleet breached its "duty to [Chain] to use reasonable care to protect and preserve the validity and value of [Chain's] collateral." (Compl.¶ 20.) There is no indication in the complaint as to what collateral Chain is referring. Fleet's motion assumed Chain was referring to the gold consigned by Fleet to Chain under the Chain–Fleet Agreement and requests judgment since Fleet had no duty to safeguard collateral not in its possession. Chain, in its memorandum in opposition to Fleet's motion, states that by collateral it meant the letter of credit and the certificates of deposit, and cited section 9–207 of the Uniform Commercial Code[9] as the source of Fleet's duty. Chain relies

---

**8.** *Krondes v. Norwalk Savings Society,* No. CV 91288829S, 1995 WL 216825, at *4–7 (Conn.Super. March 23, 1995); *Ostroff v. FDIC,* 847 F.Supp. 270, 280 (D.R.I.1994).

**9.** R.I. Gen. Laws § 6A–9–207 (2002); Conn. Gen.Stat. § 42a–9–207 (2003). This provision provides that "a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession."

upon Fleet's failure to disclose to Chain information about HHRG's financial condition and allowing Chain to make the gold transfers as the failure to safeguard collateral.

Chain has furnished no authority whatsoever for its contention that the particular events mentioned in this proceeding have anything to do with the Uniform Commercial Code section cited. The case holdings it cites are inapposite. The motion as to the Third Count is granted.

### VIII.

#### *FOURTH COUNT*

##### A.

Chain alleges in the Fourth Count that when its loan obligations to Fleet were fully satisfied by Fleet's utilization of the letter of credit and the certificates of deposit, title to the gold then vested with Chain and, therefore, "Fleet was obligated, pursuant to the [Chain–Fleet] Agreement, as amended, to return to [Chain] the gold which was deposited into [Chain's] Account at [HHRG]," which Fleet has failed to do. (Compl.¶¶ 21–22.) Chain asserts that its Fleet loans have thereby been paid twice. Fleet's motion contends that Fleet had no obligation to return gold that Chain transferred to third parties, such as HHRG, and that when Fleet acquired the gold in HHRG's possession under Fleet's security agreement, it was in partial satisfaction of HHRG's debt to Fleet, not Chain's debt to Fleet. Fleet denies Chain's assertion that Fleet has been paid twice. Chain points out that the Cash Collateral Order which allowed Fleet to receive HHRG's gold required Fleet to remain subject to bankruptcy court jurisdiction to respond to claims of Adverse Title Claimants (*i.e.,* HHRG customers claiming an interest in the Fleet collateral superior to that of Fleet).

##### B.

The court first notes that Chain does not claim a right to the gold it had transferred to HHRG superior to the Fleet security interest granted by HHRG. To that extent, Chain may not qualify as an Adverse Title Claimant contemplated by the Cash Collateral Order. The court agrees with Fleet that the gold it acquired under its HHRG security agreement represented HHRG's gold, not Chain's, and, thus, satisfaction of HHRG's debt, not Chain's. "Fleet cannot be liable for Chain's failure to secure its own interest in the gold merely because, by happenstance, both Chain and [HHRG] are customers of Fleet." (Fleet Rep. Mem. at 7.) Fleet's motion as to the Fourth Count is granted.

### IX.

#### *FIFTH COUNT*

##### A.

Chain alleges in this count, without pleading additional facts, that "[a]s a result of the aforesaid conduct on the part of Fleet, Fleet breached the implied covenant of good faith and fair dealing." (Compl.¶ 23.) "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon,* 224 Conn. 231, 238, 618 A.2d 501 (1992); *see also Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 10 (1st Cir.1994) (same under Rhode Island law). Chain contends that Fleet, having been paid twice, its failure to return gold to Chain violates the implied covenant of good faith and fair dealing. Fleet asserts it is entitled to judgment because it had no obligation to disclose HHRG's financial condition and

could not do so without breaching the duty of confidentiality it owed to HHRG.

### B.

 The court has decided that Fleet has not been paid twice. The court, however, has also ruled that whether Fleet's decision not to disclose to Chain HHRG's financial condition because of Fleet's duty of confidentiality owed to HHRG presents a genuine factual issue for trial. This applies as well to the implied covenant of good faith and fair dealing. The motion as to the Fifth Count is denied.

## X.

### SIXTH COUNT

### A.

Again, without pleading any additional facts, Chain, in this count, asserts, "[t]he aforesaid conduct on the part of Fleet constitutes oppressive, immoral, unfair and/or deceptive conduct in violation of Conn. Gen.Stat. § 42–110b." (Compl.¶ 23.)

 Conn. Gen. State § 42–110b(a) ("CUTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether a practice violates CUTPA, Connecticut courts will consider:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*Ancona v. Manafort Bros., Inc.*, 56 Conn. App. 701, 714, 746 A.2d 184, *cert. denied*, 252 Conn. 954, 749 A.2d 1202 (2000).

### B.

 Fleet argues it is entitled to summary judgment because this count is expressly dependent upon a favorable disposition of at least one of the prior counts. Since, in Fleet's view, all prior counts lack merit, it cannot be liable under the Sixth Count. Chain, in effect, agrees with Fleet that the Sixth Count depends upon at least one of the prior counts surviving Fleet's motion. Inasmuch as the court has denied Fleet's motion as to the First, Second and Fifth Counts, the motion must be denied as to the Sixth Count.

## XI.

### CONCLUSION

For the aforementioned reasons, the court grants interlocutory partial summary judgment to Fleet as to the Third and Fourth Counts, and denies summary judgment as to the remaining counts. It is

SO ORDERED.